# Use of "Unanticipated Needs" Funds to Pay the Security-Related Hotel Expenses of a Supreme Court Nominee

Payment of expenses related to Judge Sotomayor's hotel stays in Washington, D.C. during the period between her nomination to the Supreme Court and the conclusion of her confirmation hearings falls within the President's discretion under 3 U.S.C. § 108.

January 15, 2010

MEMORANDUM OPINION FOR THE
PRINCIPAL DEPUTY COUNSEL TO THE PRESIDENT

This memorandum memorializes advice we previously provided regarding whether the White House could pay certain expenses related to the Supreme Court nomination of then-Judge Sonia Sotomayor out of funds appropriated "to enable the President, in his discretion, to meet unanticipated needs for the furtherance of the national interest." 3 U.S.C. § 108(a) (2006). These expenses related to the Judge's hotel stays in Washington, D.C. during the period between her nomination and the conclusion of her confirmation hearings. We understand that, during this period, the Judge met with White House personnel whose official duties included assisting with her confirmation. We further understand that the specific amount of the expenses was driven in part by the need for Judge Sotomayor to stay at a hotel at which her security could be ensured. As we understand it, the United States Marshals Service ("USMS"), based on information obtained shortly after Judge Sotomayor's nomination, determined that Judge Sotomayor required the protection of a security detail, and specifically requested that she stay at a hotel with appropriately configured entrances. On the facts presented to us, we think that payment of these expenses falls within the President's discretion under 3 U.S.C. § 108.

On its face, section 108 confers broad authority on the President to use designated funds, "in his discretion, to meet unanticipated needs for the furtherance of the national interest." *Id.* Section 108 expressly provides that the President may exercise this discretionary authority "without regard to any provision of law . . . regulating expenditures of Government funds." *Id.* And, consistent with section 108, the appropriations bill for the fiscal year during which the expenses at issue here were incurred

appropriated one million dollars "[f]or expenses necessary to enable the President to meet unanticipated needs, in furtherance of the national interest, security, or defense which may arise at home or abroad during the current fiscal year, as authorized by 3 U.S.C. 108, . . . to remain available until September 30, 2010." Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 643 (2009). The only requirements imposed by this language are that the need for which funds are spent be "unanticipated," and that the spending of those funds further the "national interest, security, or defense."

In the years before section 108's enactment in 1978, individual appropriations acts sometimes provided funds to permit the President to respond to unanticipated needs. In earlier years, these funds were appropriated to meet needs arising from "emergencies." In the years closer to 1978, however, Congress made broader appropriations for needs that were simply "unanticipated."[1] When section 108 was enacted in November of

---

[1] In particular, the appropriations acts for fiscal years 1972, 1973, and 1974 included an appropriation of one million dollars for an "Emergency Fund for the President" for "expenses necessary to enable the President . . . to provide in his discretion for emergencies affecting the national interest, security, or defense which may arise at home or abroad during the current fiscal year." Treasury, Postal Service, and General Government Appropriation Act, 1972, Pub. L. No. 92-49, tit. III, 85 Stat. 108, 111 (1971); *see also* Treasury, Postal Service, and General Government Appropriation Act, 1973, Pub. L. No. 92-351, tit. III, 86 Stat. 471, 475 (1972); Treasury, Postal Service, and General Government Appropriation Act, 1974, Pub. L. No. 93-143, tit. III, 87 Stat. 510, 514 (1973). The appropriation for fiscal year 1975, similarly, included an appropriation of $500,000 for "Unanticipated Personnel Needs" for "expenses necessary to enable the President to meet unanticipated personnel needs, for emergencies affecting the national interest, security, or defense which may arise at home or abroad during the current fiscal year." Treasury, Postal Service, and General Government Appropriation Act, 1975, Pub. L. No. 93-381, tit. III, 88 Stat. 613, 617 (1974).

The appropriations acts for fiscal years 1976 through 1979, in contrast, omitted mention of "emergencies," and included an appropriation for "Unanticipated Needs" for "expenses necessary to enable the President to meet unanticipated needs, in furtherance of the national interest, security, or defense which may arise at home or abroad during the current fiscal year." Treasury, Postal Service, and General Government Appropriation Act, 1976, Pub. L. No. 94-91, tit. III, 89 Stat. 441, 445 (1975); *see also* Treasury, Postal Service, and General Government Appropriation Act, 1977, Pub. L. No. 94-363, tit. III, 90 Stat. 963, 968 (1976); Treasury, Postal Service, and General Government Appropriation Act, 1978, Pub. L. No. 95-81, tit. III, 91 Stat. 341, 346 (1977); Treasury, Postal Service, and General Government Appropriations Act, 1979, Pub. L. No. 95-429, tit. III, 92 Stat. 1001, 1006 (1978). The House report accompanying one of these acts indicated

1978, it borrowed this broader language from the appropriations acts that immediately preceded it, and provided funds for unanticipated needs generally, without any restriction to "emergencies." The House and Senate reports accompanying section 108 noted that it "continues the authority provided by recent appropriations acts for a fund to enable the President, in his discretion, to meet unanticipated needs 'for furtherance of the national interest, security, or defense,'" without mentioning any restriction to emergencies. H.R. Rep. No. 95-979, at 10 (1978); S. Rep. No. 95-868, at 11 (1978). And the practice under section 108 in the decades since its enactment confirms that its scope is not restricted to emergencies. Previous administrations, moreover, have likewise declined to construe the term "national interest" as a narrow category restricted to matters closely connected with national security or defense, and instead interpreted it as an independent, broad category that gives the President the flexibility needed to exercise his official functions when faced with new problems that arise after the appropriations process for a given year has been completed.

Thus, according to a summary of Executive Office records provided by your office, section 108 appropriations, for example, have been used to fund advisory commissions in the Executive Branch, such as the Native Hawaiians Study Commission and the Council on Wage and Price Stability, that were charged with missions apparently unrelated to national security or defense. *See* Executive Office of the President, Unanticipated Needs History at 1 (FY 1972–present) ("Unanticipated Needs History"); *see also* Budget of the United States Government, Fiscal Year 1984, app. at I-D3; Budget of the United States Government, Fiscal Year 1982 ("Budget FY 1982"), app. at I-D4. Other uses of section 108 funds have included unspecified expenditures for the White House Office, the Iran-contra hearings, the U.S. Secret Service, Geneva Mission security for the Office of the U.S. Trade Representative, presidential foundation expenses for the funerals of Presidents Reagan and Ford, White House Office

---

that the purpose of the appropriation was to provide "a resource that the President can effectively use to solve problems that occur after the appropriation process has been completed." H.R. Rep. No. 95-378, at 25 (1977). The report went on to observe that "[t]he appropriation of funds is a time consuming process and the President ought to have some degree of flexibility to handle unforeseen emergencies," *id.*, although—as noted—the terms of the act were broad and not limited to "emergencies."

expenses for President Ford's funeral, and an Office of Administration e-mail restoration initiative. *See* Unanticipated Needs History at 1–3; *see also* Budget FY 1982, app. at I-D4; Budget of the United States Government, Fiscal Year 1989, app. at I-D1; Letter for Susan M. Collins, Chairwoman, Senate Committee on Homeland Security, from John Straub, Special Assistant to the President, encl. (Mar. 20, 2006) (Unanticipated Needs Account); Letter for Harry Reid, Senate Majority Leader, from Alan R. Swendiman, Special Assistant to the President, encl. (Nov. 23, 2007) (Unanticipated Needs Account); Letter for Harry Reid, Senate Majority Leader, from Sandra K. Evans, Special Assistant to the President, encl. (Nov. 4, 2008) (Unanticipated Needs Account). These expenditures have been reported to Congress on a yearly basis and Congress, far from viewing them as inappropriate, has continued to appropriate funds for unanticipated needs virtually every year.[2] Finally, and even more directly, this Office has previously suggested that the President's discretion under section 108 may include the authority to pay travel expenses incurred by persons who are not employees of the government but who are traveling for purposes related to the duties of the President. *See* Memorandum for Michael E. Shaheen, Jr., Counsel, Office of Professional Responsibility, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Use of Department of Justice Vehicles* at 13 n.12 (Jan. 23, 1984) (explaining that, "[u]nlike the Attorney General, the President has several possible sources of appropriated funds from which a nonemployee traveling for official purposes of the Presidency might be paid expenses," and citing section 108).

In light of section 108's broad language and this prior practice and precedent, we believe use of "unanticipated needs" funds to pay for the expenses at issue here would be permissible. The timing of Justice David Souter's resignation announcement may fairly be described as "unanticipated," giving rise to the associated costs of ensuring that the nominee who had been named to replace him would be readily available to the White House personnel who are officially responsible for assisting with

---

[2] Based on the information you provided, the only year in which Congress did not appropriate section 108 funds was in fiscal year 1997, when the one million dollars requested for unanticipated needs were diverted to fund conferences on model state drug laws through the Office of National Drug Control Policy. *See* Unanticipated Needs History at 3 n.1.

the confirmation process. Moreover, the particular expenses at issue here may also be characterized as "unanticipated," given that the USMS unexpectedly received information about the President's nominee that caused it to determine that she required the protection of a security detail, and to request that she stay at a hotel with appropriate security features. And we think it is in furtherance of the national interest to protect the security of a Supreme Court nominee prior to confirmation and swearing in, as well as to ensure that the President's advisors may effectively and efficiently assist him in carrying out his constitutional authority to appoint a nominee to the Supreme Court to fill a vacancy in that body. (We also understand that the cost of housing Judge Sotomayor in Washington during the confirmation process was significantly less than the expected cost of moving the White House preparation team to New York to meet with Judge Sotomayor there.) We therefore conclude that Judge Sotomayor's expenses may properly be paid with funds appropriated under section 108.

JEANNIE S. RHEE
*Deputy Assistant Attorney General*
*Office of Legal Counsel*